**COLORADO VISIONARY ACADEMY, a Colorado non-profit corporation, Plaintiff,**

**v.**

**MEDTRONIC, INC., a Minnesota corporation; and Tobin Real Estate Company, d/b/a Cresa Partners–Minneapolis/St. Paul, a Minnesota corporation, Defendants.**

No. CIV.A. 99–N–1628.

United States District Court, D. Colorado.

July 7, 2000.

Miles M. Gersh, James S. Helfrich, John Astuno, Jr., Denver, CO, for Plaintiff.

Stuart Pack, Charles F. McVay, Byeong-sook Seo, Todd P. Walker, Denver, CO, for Defendants.

### ORDER DENYING MOTION TO AMEND

BOLAND, United States Magistrate Judge.

This matter is before me on the **Motion to Amend Defendants' Answer to Plaintiff's Amended Complaint and Memorandum Brief In Support** (the "Motion to Amend"), filed June 15, 2000. The plaintiff, Colorado Visionary Academy ("CVA"), opposes the Motion to Amend. Because the defendants have failed to establish good cause in support of their request to alter the Scheduling Order entered in this case, the Motion to Amend is DENIED.

CVA is a charter school.[1] In June of 1999, CVA executed a "term sheet" concerning the purchase by CVA of real property and im-

---

1. In the Preliminary Pretrial Order, the defendants assert that "as of June 30, 2000, CVA will cease to exist. On May 2, 2000, the Douglas County School District ('DCSD') denied CVA's charter renewal application. CVA appealed that decision to the State School Board and lost the appeal on June 1, 2000." Preliminary Pretrial Order, at p. 7. CVA denies that it will cease to exist. *Id.*, at p. 18.

provements owned by defendant Medtronic, Inc. ("Medtronic"). According to CVA's allegations in its Amended Complaint:

> The terms of the sale and purchase of the Property contemplated CVA's purchase of the Property and approximately two-thirds of the Building for $4,300,000; Medtronic's gift of approximately one-third of the Building to CVA; and CVA's grant of a lease back of the one-third of the Building to Medtronic as additional consideration.

Amended Complaint and Jury Demand ("Amended Complaint"), at ¶ 11.

The sale was never consummated, however. Again according to CVA:

> In July [1999], after securing the necessary approvals from the Town of Parker with the participation of CVA, defendant Medtronic organized and conducted an orientation meeting for parents of CVA students. That meeting was chaired by Medtronic Operations Manager Tracy Sherman, who gave elaborate assurances regarding the safety features and measures to be incorporated into the shared facility. The parties had exchanged drafts of a written purchase contract, and on July 26 (the Monday after defendant's orientation session for CVA parents), a draft lease was sent ... to CVA's attorneys. However, after first postponing the signing date to the week of August 2, Medtronic abruptly announced on Wednesday, August 4, 1999 that it was now terminating the sale, because of "risk management" considerations.

Preliminary Pretrial Order, at p. 4.

Medtronic apparently conducts manufacturing operations at the property which involve chemicals and human and bovine blood. In July of 1999, a memorandum was prepared by Gary Nelson of Medtronic's risk management group discussing "risk management challenges" associated with a possible sale of the Medtronic facility to CVA:

> Several weeks ago, Corporate Facilities informed us of [the intention of the Blood Management group in Parker, Colorado] of selling our existing facility (143000 sq. ft.).... During this process, the business was approached by a group of individuals who were in the process of starting a K–8 charter school. Our understanding of the tentative deal being struck between the parties is that the charter school will buy the entire property outright from Medtronic and, in turn, lease approximately 50,000 sq. ft. back to us for the continued manufacturing operations, free of charge for the next 20 years....

> With all of the good news about this proposal, [risk management] is like a voice in the wilderness when we look at the inherent risks of the proposal. Although we have not undertaken a detailed review of the Parker operation, we have identified, through our Health and Safety folks, that this operation currently uses two strong solvents, methylene chloride and methyl ethyl ketone. The former chemical is a known carcinogen and has its own OSHA standard. The plan is to stop using methylene chloride and bovine blood on the premises in the November time frame when this portion of the operation will be moved to Mexico. The remaining operation will continue to use Glutaraldehyde, which requires special ventilation/handling precautions. Finally, the operation currently uses bovine blood and plasma and human blood.... Biohazardous waste containment and hauling processes are involved.

CVA brought suit against Medtronic and others for failure to complete the sale. The Amended Complaint asserts claims of promissory estoppel and negligent misrepresentation.

A Scheduling Order was entered on December 20, 1999, which established March 1, 2000, as the deadline for joinder of parties and amendment of pleadings. On February 29, 2000, CVA filed a motion to amend the complaint. The Amended Complaint deleted certain claims and made more specific the allegations concerning the defendants' alleged representations to CVA. The defen-

dants did not oppose the motion to amend, and it was granted on March 30, 2000. The defendants answered the Amended Complaint on April 14, 2000.

Sixty-two days later, on June 15, 2000, the defendants filed their Motion to Amend, seeking leave to add the defense of comparative negligence. In support of their motion, the defendants cite Fed.R.Civ.P. 15(a) and *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962), for the proposition that leave to amend shall be freely given when justice requires. In further support of the Motion to Amend, defendants stated:

> Defendants' sixty (60) day delay in recognizing the comparative fault defense is due to the fact that until Defendants conducted additional research into the substantive law behind Plaintiff's claims, Defendants did not appreciate that its long-held assertions that Plaintiff did not reasonably rely were tantamount to a comparative fault defense.... Defendants have recently learned through additional substantive research that Colorado's comparative fault statute is construed broadly enough to encompass Plaintiff's conduct.

Defendants' Reply Brief In Support of Motion to Amend Defendants' Answer (Defendants' Reply Brief), at p. 4.

 This case is similar to *Dilmar Oil Co., Inc. v. Federated Mutual Ins. Co.,* 986 F.Supp. 959 (D.S.C.1997), *aff'd,* 129 F.3d 116 (4th Cir.1997), where the plaintiff sought leave to amend its complaint after the deadline for amendments established by the court's previous Rule 16(b) Scheduling Order had passed. The court denied the motion, stating:

> Where, as here, a motion to amend the pleadings ... is filed after the scheduling order deadline, a "two-step analysis" is required. Once a scheduling order's deadline for amendment has passed, a movant must first demonstrate to the court that it has a "good cause" for seeking modification of the scheduling deadline under Rule 16(b). If the movant satisfies Rule 16(b)'s "good cause" standard, it must then pass

the requirements for amendment under Rule 15(a)....

> Rule 16(b)'s "good cause" standard is much different than the more lenient standard contained in Rule 15(a). Rule 16(b) does not focus on the bad faith of the movant, or the prejudice to the opposing party. Rather, it focuses on the diligence of the party seeking leave to modify the scheduling order to permit the proposed amendment. Properly construed, "good cause" means that scheduling deadlines cannot be met despite a party's diligent efforts. In other words, this court may "modify the schedule on a showing of good cause if [the deadline] cannot be met despite the diligence of the party seeking the extension." Carelessness is not compatible with a finding of diligence and offers no reason for a grant of relief.

*Id.* at 980 (internal citations omitted). *Accord Denmon v. Runyon,* 151 F.R.D. 404, 407 (D.Kan.1993)(affirming the order of a magistrate judge denying the plaintiff's motion to amend the complaint after the deadline established by the scheduling order, stating: "To establish 'good cause,' the party seeking to extend the deadline must establish that the scheduling order's deadline could not have been met with diligence").

 Judge Charles Richey addressed this issue in "Rule 16: A Survey and Some Considerations for the Bench and Bar," 126 F.R.D. 599, 604 (1989), stating:

> [I]t is clear that the "good cause" required to modify a scheduling order, when the modification is sought in order to permit an amended pleading, is not coterminous with the amendment standard embodied in Rule 15(a). Instead, Rule 16(b) erects a more stringent standard, requiring some persuasive reason as to why the amendment could not have been effected within the time frame established by the court.

(Internal citations omitted.) *See also* Advisory Committee Notes to 1983 Amendment to Fed.R.Civ.P. 16(b)("[T]he court may modify the schedule on a showing of good cause if it cannot reasonably be met despite the dili-

gence of the party seeking the extension. Since the scheduling order is entered early in the litigation, this standard seems more appropriate than a 'manifest injustice' or 'substantial hardship' test").

Applying the applicable standard to the facts of this case leads me to conclude that the defendants have failed to establish good cause in support of their Motion to Amend. In particular, the defendants admit that the delay in seeking amendment is the result of their failure earlier in the case to do the research necessary to recognize the applicability of the defense they seek to add. There is no assertion that new facts were developed during discovery that resulted in the need to amend. To the contrary, the defendants argue that the defense is derived from their "long-held assertions that Plaintiff did not reasonably rely" on the defendants' conduct or representations. Defendants' Reply Brief, at p. 4. Nor is the need to amend based upon recent developments in the law. The cases relied on by the defendants in support of the applicability of the defense of comparative negligence were decided in 1995 or before. *Id.*

IT IS THEREFORE ORDERED that the Motion to Amend is DENIED.